UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

MICHAEL JAMES,

                        Petitioner,          REPORT AND
                                             RECOMMENDATION

        - against -                          05-CV-1992 (BMC) (MDG)

LUIS R. MARSHALL, Superintendent of
Wallkill Correctional Facility,

                        Respondent.

- - - - - - - - - - - - - - - - - X

GO, United States Magistrate Judge:

     Petitioner Michael James seeks a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  The petition in this matter was

referred to me to report and recommend by the Honorable Nicholas

G. Garaufis.[1]  For the following reasons, I recommend that the

petition be denied.


                    **PROCEDURAL BACKGROUND**

     Michael James was charged with one count each of robbery in

the first degree, N.Y. Penal Law § 160.15(3), robbery in the

second degree, id. § 160.10(1), criminal possession of a weapon

in the fourth degree, id. § 265.01(2), criminal possession of

stolen property in the fifth degree, id. § 165.40, and menacing

in the second degree, id. § 120.14(1).  Following a jury trial

---

[1] The petition was subsequently reassigned to the Honorable
Brian M. Cogan.

before the Honorable Jaime Rios, petitioner was convicted of both robbery counts, criminal possession of a weapon in the fourth degree and menacing in the second degree. On July 11, 2000, Justice Rios sentenced petitioner to concurrent terms of imprisonment of seven to fourteen years for each of the robbery convictions and one year each for the other two convictions. According to the New York Department of Correctional Services' website, petitioner was released on parole on April 11, 2007.[2]

Dunaway/Mapp/Huntley/Wade Hearing

Prior to trial, the Honorable Thomas A. Demakos conducted a hearing to determine the admissibility of, inter alia, testimony regarding the show-up and in-court identifications of petitioner and the knife seized from a car he was driving. Police Officers Carmine Antoniello and James O'Connor of the 110th Precinct in Queens testified.

On May 11, 1998, at approximately 11:05 p.m., while he was on routine patrol, Officer Antoniello received a radio transmission concerning a robbery in progress on 111th Street and 49th Avenue. Transcript of Dunaway/Mapp/Huntley/Wade Hearing held on June 3, 1999 ("Hearing Tr.") at 6, 22-23, 62. The radio report described the perpetrators as four male blacks in their late teens to early twenties, who fled the scene in a 1990's blue

---

[2] Although James has been released on parole, "he remains 'in custody' for habeas proceedings." Dixon v. Miller, 293 F.3d 74, 78 (2d Cir. 2002); see Mabry v. Johnson, 467 U.S. 504, 507 n.3 (1984).

Ford Taurus, with the license plate number "K363Z6."  Id. at 7,
22-25, 27, 62, 66.  Approximately twenty minutes later, as
Officer Antoniello canvassed the area looking for the suspects,
he spotted a vehicle traveling eastbound on Corona Avenue, about
one mile from the scene of the crime.  Id. at 8, 29, 33, 57.  The
car drew his attention because it was a blue Ford Taurus and the
first three characters on its license plate were "K36."  Id. at
8-9, 57.  He also noticed that the driver appeared startled when
he made eye contact with him.  Id. at 9-10, 57.  When Officer
Antoniello pulled the car over, he saw that the full license
plate number was "K363ZS."  Id. at 10-11, 30, 56, 58.

There were three men in the car: petitioner in the driver's
seat, co-defendant Dwayne Bryan in the front passenger seat and
another man, Supreme Clark, in the back seat.  Id. at 12-13.
While his partner reported over the radio that they had stopped a
vehicle and that the victim should be brought to the scene,
Officer Antoniello ordered the three occupants of the vehicle to
step outside of the car.  Id. at 12, 14, 31-33,  36-38, 60.

Police Officer James O'Connor, who arrived at the car stop
between 11:20 and 11:25 p.m., looked through the open front door
of the passenger side of the vehicle and observed part of a knife
blade and handle sticking out of the front passenger seat.  Id.
at 63-66, 68-70, 72.  He retrieved the knife and handed it to
Officer Antoniello.  Id. at 64, 70.

Within five minutes of the radio call by Officer
Antoniello's partner, the complaining witness, Robert Vargas,

arrived in a police van, which pulled up across the street.  Id.
at 14, 35, 38-39, 41, 45.  At that time, the three suspects were
standing at the rear of the blue Ford Taurus, with 10 to 12
police officers standing "right near them."  Id. at 14, 16-17,
33, 35, 38-41, 45, 67.  There were at least four or five police
cars at the scene.  Id. at 63, 67.  Remaining in the van, Vargas
told Officer Antoniello that four men had robbed him and that the
three suspects had been involved in the robbery.  Id. at 14-16,
22, 41-42, 45, 54-56.  In response to the officer's question as
to each suspect's role in the robbery, Vargas stated that
petitioner wielded a knife and ordered him to give them money,
while co-defendant Bryan, also holding a knife, took Vargas'
money.  Id. at 16, 55-56.  Supreme Clark and another man stood in
the background during the robbery.  Id. at 16, 41-42, 54-55.

   After Vargas' identification, the three suspects were placed
under arrest.  Id. at 16, 46.  At the precinct, the arrestees
were searched and $8 was recovered from co-defendant Bryan's
pocket.  Id. at 17.  Petitioner asked Officer Antoniello why he
was arrested.  Id. at 18-19, 49-51.  After Officer Antoniello
replied that he was arrested for robbery, petitioner responded
that they had been out looking for girls and did not rob anyone.
Id. at 19, 49-51.

   The hearing court denied the motions to suppress the knife
and the identification, ruling that the police properly stopped
the car because it matched the complaining witness' description
and correctly brought the complaining witness to the scene to

-4-

confirm whether the suspects were involved in the robbery. <u>Id.</u> at 77. The court also found that the identification was proper and that the police had probable cause to arrest petitioner once the complaining witness identified the suspects as the men who robbed him. <u>Id.</u> at 78. The court further held that the knife was properly seized since it was in plain view and would have been recovered in any event pursuant to an inventory search of the vehicle. <u>Id.</u> at 78-79. The court did, however, suppress petitioner's statement because it was made without <u>Miranda</u> warnings. <u>Id.</u> at 79.

<u>Evidence At Trial</u>

After the first trial of petitioner and co-defendant Dwayne Bryan resulted in a hung jury, a second jury trial commenced on April 7, 2000. Besides Officers O'Connor and Antoniello, Robert Vargas also testified.

Robert Vargas testified that on May 11, 1998, at approximately 10:50 p.m., he was returning from night school to his home in Corona, Queens. Transcript of trial commenced on April 7, 2000 ("Tr.") at 689-92, 752-54. As he walked southward along 111th Street and neared the intersection of 49th Avenue, two African-American men approached him and demanded money. <u>Id.</u> at 692-93, 701, 740-41. He had first noticed the two men when they were about 20 feet in front of him. <u>Id.</u> at 693. One man was about 5'7" or 5'8" with some facial hair, while the other man was about six feet tall. <u>Id.</u> at 693-94, 727-28, 765. Vargas

identified the shorter man as petitioner and the taller man as co-defendant Bryan. Id. at 695. When petitioner came within an arm's length away from Vargas, petitioner pulled out a knife, while Bryan walked around to Vargas' side, slightly to the back. Id. at 694, 696-98. Two other African-American men stood on the corner of 49th Avenue, about 15 to 20 feet away. Id. at 701-02, 718, 722-23.

Although Vargas told the men that he had no money, petitioner felt Vargas' front pockets. Id. at 697, 742. As Vargas removed his wallet from his back pocket to show them that he had no money, Bryan grabbed the wallet and took out about $8. Id. at 698-700. Bryan tossed the wallet to Vargas after Vargas asked for his papers back. Id. at 700.

Vargas testified that the incident lasted three to five minutes, with petitioner standing in front of him holding a knife upward toward Vargas' face. Id. at 698-99, 703, 748-49. Vargas was nervous during the encounter and did not focus directly on the men because he was looking for an escape route and paying attention to the knife. Id. at 742-43, 745, 772, 803. Vargas estimated that the nearest street light was approximately 12 feet away, but the lighting "was pretty good." Id. at 693, 743.

Because the two men who robbed him and the two other men remained in front of him at the corner of 111th Street and 49th Avenue, Vargas crossed 111th Street to go home. Id. at 701-02, 746-47. After Vargas crossed 49th Avenue, he saw the men run from behind him west on 49th Avenue to get into a sky blue Ford

Taurus, parked about 15 feet from the corner where Vargas was. Id. at 703-05, 721-22. Vargas wrote down the license plate number of the car: "K363Z6." Id. at 705-06, 771-72, 802.

A few minutes later, Vargas called 911 and told the operator that he had been robbed at knife point by four black men in their late teens to early twenties, who fled in a 1993 or 1994 sky blue Ford Taurus, with the license plate number K363Z6. Id. at 687, 706-07, 723-25. The police arrived about 5 minutes later. Id. at 707. Vargas then rode around in a police van for 20 to 40 minutes looking for the suspects. Id. at 707, 739, 777.

At approximately 11:05 p.m., Officer Antoniello received a radio transmission that a robbery was in progress. Id. at 584. After first going to the scene of the crime, Officer Antoniello began canvassing the area for the suspects. Id. at 584-86, 613. At approximately 11:25 p.m., while traveling westbound on Corona Avenue, Officer Antoniello saw a blue Ford Taurus traveling eastbound on Corona Avenue, which had a license plate number beginning with "K36". Id. at 587-89. When he pulled the car over, he noticed that its license plate number was "K363ZS." Id. at 589-92. Petitioner was driving the car, co-defendant Bryan was riding in the front seat and Supreme Clark was sitting in the back. Id. at 590, 592-93. The three men in the car exited the vehicle at Officer Antoniello's request. Id. at 591-92. Officer Antoniello testified that petitioner had a beard and a mustache at the time. Id. at 670.

At approximately 11:20 p.m., Officer O'Connor went to the

car stop in response to a radio transmission that a car believed
to be involved in a robbery was stopped at National Street and
Corona Avenue.  Id. at 559-60.  As he looked inside the car
through the open front passenger door, Officer O'Connor observed
a knife in the front passenger seat, which he retrieved and gave
to Officer Antoniello.  Id. at 561, 594, 631.

Approximately 5 to 10 minutes later, Vargas arrived at the
car stop in a police van.  Id. at 593.  The officers in the van
with Vargas told him that "they thought they probably have the
people who did it."  Id. at 707-08, 777.  Upon his arrival at the
car stop, Vargas recognized the car as the one the robbers drove
by its model and color.  Id. at 708.  Vargas told Officer
Antoniello that he was surrounded by four men who robbed him, two
of whom wielded knives.[3]  Id. at 618-19, 657.  Officer Antoniello
pointed to the suspects and asked Vargas whether those were the
men who robbed him and what role each man had played in the
robbery.  Id. at 603, 631.  Vargas immediately identified
petitioner as the shorter man, co-defendant Bryan as the taller
man and Supreme Clark as one of the men standing on the corner.
Id. at 592, 694-95, 708-09.  Vargas, however, testified that he
could not identify Supreme Clark by his face and did not see the
two men on the corner well enough to describe them other than to

---

[3] Officer Antoniello testified that when he interviewed
Vargas, Vargas told him that both of these men wielded knives and
that he was "surrounded" by the four men.  Id. at 618-619, 664-
65, 667, 675-76.  On cross-examination, Vargas denied saying
that.  Id. at 721, 763.

state they were black males.  _Id._ at 701, 722-23, 781.  When
Officer Antoniello showed Vargas the knife seized from the car,
Vargas identified it as the one used in the robbery.  _Id._ at 641,
708, 710, 750.  However, on cross-examination, Vargas admitted
that he could not be certain that it was the same knife.  _Id._ at
750.

Vargas made his identifications approximately 45 minutes
after the robbery, while in the van, as the suspects stood about
20 to 30 feet away, surrounded by four to eight police officers.
_Id._ at 572, 662-63, 707-08, 776, 780, 786, 788-89.  Officer
Antoniello testified that there was good lighting on the street
from both the street lamps and the lights from the police cars,
but that the nearest street light to the suspects was 30 to 40
feet away.  _Id._ at 611-12, 629, 673; _see_ _also_ _id._ at 716.

At the precinct, Officer Antoniello recovered $35 from
Bryan.  _Id._ at 604, 607-08, 635-40, 787.  While Officer
Antoniello conceded that there was no way to know if the $8 in
Bryan's possession was the same cash that was taken from Vargas,
Vargas identified the cash as his money.  _Id._ at 636-40, 787.

The jury convicted petitioner of all the counts, except for
criminal possession of stolen property, and acquitted co-
defendant Bryan of all charges.

Post-conviction History
On May 2, 2000, petitioner filed a motion to set aside the
verdict on the grounds of juror misconduct, which Judge Rios

denied.  See Petitioner's Motion to Set Aside the Verdict
(annexed to Declaration of Michelle Maerov filed on April 19,
2007 ("4/19/07 Decl.") (ct. doc. 19) as Exh. B); Order dated July
7, 2000 denying motion to set aside the verdict (annexed to
4/19/07 Decl. as Exh. E).  On August 2, 2000, petitioner filed a
pro se motion to vacate his conviction on the grounds that the
verdict was repugnant because his co-defendant was acquitted of
all charges.  See Petitioner's Motion to Vacate the Conviction
(annexed to Declaration of Michelle Maerov filed on July 28, 2005
("Maerov Decl.") (ct. doc. 10) as Exh. A).  After Justice Rios
denied the motion by order dated September 5, 2000, petitioner
moved for leave to appeal the denial of his motion to the
Appellate Division, Second Department.  See Petitioner's Motion
for Leave to Appeal (annexed to Maerov Decl. as Exh. C); Short
Form Order (annexed to Maerov Decl. as Exh. B).  On April 8,
2005, the Appellate Division denied petitioner's application for
leave to appeal.  See Decision & Order (annexed to Maerov Decl.
as Exh. E).

    In March 2002, petitioner, through counsel, directly
appealed his conviction to the Appellate Division, Second
Department, arguing that his guilt was not proven beyond a
reasonable doubt and that his conviction was against the weight
of the evidence.  See Petitioner's Appellate Division Brief
(annexed to Maerov Decl. as Exh. F).  Petitioner also filed a pro
se supplemental brief, claiming he was arrested without probable
cause; the show-up identification was unduly suggestive; and the

verdict was repugnant.  See Petitioner's Pro Se Supplemental
Appellate Division Brief (annexed to Maerov Decl. as Exh. H).

On December 22, 2003, the Appellate Division affirmed
petitioner's conviction.  People v. James, 2 A.D.3d 751, 768
N.Y.S.2d 648 (2d Dep't 2003).  The Appellate Division held that
the evidence was "legally sufficient to establish [petitioner's]
guilt beyond a reasonable doubt" and the verdict was not against
the weight of the evidence.  Id. at 648.  The Appellate Division
was "not persuaded that the showup identification procedure was
unreasonable," finding that the show-up was "prompt and
reliable," "in close spatial and temporal proximity to the scene
of the crime" and "not unduly suggestive."  Id.  Justice McGinity
dissented on this point, arguing that the "identification
procedure was so unnecessarily suggestive as to create a
substantial likelihood of misidentification requiring
suppression."  Id. at 650.  Finally, the Appellate Division held
that the petitioner's "remaining contentions, including those
raised in his supplemental pro se brief, are without merit."  Id.
at 648.  On March 5, 2004, the Court of Appeals denied
petitioner's request for leave to appeal.  People v. James, 2
N.Y.3d 741, 778 N.Y.S.2d 467 (2004).

On July 17, 2004, petitioner filed a pro se writ of error
coram nobis alleging ineffective assistance of appellate counsel
for failing to challenge the repugnant jury verdict which
resulted in the acquittal of the co-defendant and conviction of
petitioner; and the impropriety of the show-up identification

-11-

procedure.  <u>See</u> Petitioner's Motion for a Writ of <u>Error</u> <u>Coram</u>

<u>Nobis</u> (annexed to Maerov Decl. as Exh. N).  On November 1, 2004,

the Appellate Division denied petitioner's application.  <u>People</u>

<u>v. James</u>, 12 A.D.3d 380, 783 N.Y.S.2d 299 (2d Dep't 2004).

On March 28, 2005, petitioner filed a <u>pro</u> <u>se</u> habeas petition

in the Western District of New York raising the following claims:

1.  The verdict was repugnant because petitioner's co-
    defendant was acquitted;
2.  The verdict was legally insufficient and against
    the weight of the evidence;
3.  Petitioner was arrested without probable cause;
    and
4.  The show-up identification was unduly suggestive.

<u>See</u> Petition for Writ of Habeas Corpus ("Petition") (ct. doc. 5-

2).  On April 4, 2005, this action was transferred to the Eastern

District of New York.  <u>See</u> ct. doc. 5-5.

**<u>DISCUSSION</u>**

I.  <u>Applicable Law for Habeas Review</u>

The writ of habeas corpus is available to any person held

"in custody in violation of the Constitution or laws or treaties

of the United States."  28 U.S.C. § 2254(a).  Since this petition

was filed after the enactment of the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), the provisions of AEDPA

govern to the extent applicable.  <u>See</u> <u>Williams v. Taylor</u>, 529

U.S. 362, 402-03 (2000); <u>Boyette v. Lefevre</u>, 246 F.3d 76, 88 (2d

Cir. 2001).

A.  <u>Standard of Review</u>

AEDPA created a new standard of review intended to "place[]

a new restriction on the power of federal courts to grant writs
of habeas corpus to state prisoners." <u>Williams</u>, 529 U.S. at 399.
A court reviewing a habeas petition under AEDPA may not grant a
writ "with respect to any claim that was adjudicated on the
merits in State court proceedings unless" the state court
decision was either (1) "contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by
the Supreme Court of the United States" or (2) "based on an
unreasonable determination of the facts in light of the evidence
presented in the State court proceeding."  28 U.S.C. § 2254(d).

　　　The two clauses of subsection (1) have "independent
meaning." <u>Williams</u>, 529 U.S. at 364.  Under the first clause, a
state court decision will be considered "contrary to" federal law
if it either "applies a rule that contradicts the governing law
set forth in [the Supreme Court's] cases" or "confronts a set of
facts that are materially indistinguishable from a decision of
[the Supreme] Court and nevertheless arrives at a result
different from [Supreme Court] precedent." <u>Williams</u>, 529 U.S. at
405-06 (O'Connor, J., concurring).

　　　Under the second clause, habeas relief may be granted if the
state court decision "correctly identifies the governing legal
rule but applies it unreasonably to the facts of a particular
prisoner's case." <u>Williams</u>, 529 U.S. at 407-08.  Whether a state
decision is an "unreasonable application" of federal law must be
based on an objective standard and relief may not be granted
unless a relevant state court decision is both erroneous and

-13-

unreasonable.  <u>Id.</u> at 409, 411.  "An unreasonable application of

federal law is more than an incorrect application, but the

petitioner need not show that all reasonable jurists would agree

that a state court determination is incorrect in order for it to

be unreasonable."  <u>Yung v. Walker</u>, 296 F.3d 129, 135 (2d Cir.

2002).

In reviewing findings of fact under AEDPA, federal courts

must assess whether the state court's determination was based on

"an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."  28 U.S.C.

§ 2254(d)(2).  Under this standard, a state court's

determinations of fact shall be "presumed to be correct," and the

habeas petitioner "shall have the burden of rebutting the

presumption of correctness by clear and convincing evidence."  28

U.S.C. § 2254(e)(1).

A state court need not set forth the legal basis for

resolution of federal claims in order for the broadly deferential

standard set out in AEDPA to apply.  <u>See</u> <u>Sellan v. Kuhlman</u>, 261

F.3d 303, 311-12 (2d Cir. 2001).  Rather:

> [T]he plain meaning of § 2254(d)(1) dictates [that for]
> the purposes of AEDPA deference, a state court
> 'adjudicate[s]' a state prisoner's federal claim on the
> merits when it (1) disposes of the claim 'on the
> merits,' and (2) reduces its disposition to judgment.
> When a state court does so, a federal habeas court must
> defer in the manner prescribed by 28 U.S.C.
> § 2254(d)(1) to the state court's decision on the
> federal claim -- even if the state court does not
> explicitly refer to either the federal claim or to
> relevant federal case law.

<u>Id.</u> at 312.

B.    Procedural Requirements

Prior to bringing a petition for habeas corpus pursuant to 28 U.S.C. § 2254, a petitioner must exhaust the remedies available in state court or demonstrate that "there is an absence of available State corrective process [or] [that] circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b); see Keeney v. Tamayo-Reyes, 504 U.S. 1, 9-10 (1992); Rose v. Lundy, 455 U.S. 509 (1982); DiSimone v. Phillips, 461 F.3d 181, 190 (2d Cir. 2006). The exhaustion requirement is based upon the principle of "comity," or respect for states, by giving states the first opportunity to pass upon convictions rendered in their courts. See Duncan v. Henry, 513 U.S. 364, 365-66 (1995); Duckworth v. Serrano, 454 U.S. 1 (1981); Ellman v. Davis, 42 F.3d 144, 147 (2d Cir. 1994).

In order to exhaust claims, petitioners must "fairly present" their constitutional claims to the highest state court. See Picard v. Connor, 404 U.S. 270, 275 (1971); Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 808 (2d Cir. 2000); Daye v. Attorney General of the State of New York, 696 F.2d 186, 194 (2d Cir. 1982) (en banc).  In other words, the claims presented by a petitioner to the State appellate courts must be the "substantial equivalent" of the claims he raises in the federal habeas petition.  Picard, 404 U.S. at 278.  A petitioner may satisfy this fair presentation requirement by (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on

-15-

state cases employing constitutional analysis in like fact
situations, (c) assertion of a claim in terms so particular as to
call to mind a specific right protected by the Constitution, or
(d) alleging a pattern of facts that is well within the
mainstream of constitutional litigation.  <u>Daye</u>, 696 F.2d at 194;
<u>see also</u> <u>Jimenez v. Walker</u>, 458 F.3d 130, 149 (2d Cir. 2006).

## II.  <u>Inconsistency of Verdicts</u>

Petitioner argues that his Fourteenth Amendment rights were
violated because he was convicted of robbery in the second degree
under the theory of being aided by another person actually
present, while his co-defendant was acquitted of all charges.
<u>See</u> Petition at ¶ 12(A).  Petitioner raised this claim in his <u>pro</u>
<u>se</u> motion to vacate his conviction and his <u>pro</u> <u>se</u> supplemental
brief on direct appeal, both of which were denied on the merits.
<u>See</u> Maerov Decl., Exhs. A, B, H; <u>James</u>, 768 N.Y.S.2d at 648.

Respondent argues that petitioner did not exhaust this claim
in state court because he argued on direct appeal only that the
verdict violated state law, rather than the United States
Constitution.  <u>See</u> Resp.'s Mem. of Law in Opp. at 11 (ct. doc.
10-2).  Respondent concedes, however, that petitioner cited the
Fifth and Fourteenth Amendments in his letter to the Court of
Appeals seeking leave to appeal.  <u>Id.</u>; Petitioner's Leave
Application to the Court of Appeals at 2 (annexed to Maerov Decl.
as Exh. K).  Although respondent is correct that a claim is not
"fairly presented" where it is raised for "the first and only

time" in an application for discretionary review in the Court of
Appeals, see Castille v. Peoples, 489 U.S. 346, 351 (1989) (cited
by respondent), the claims that petitioner raised in his letter
to the Court of Appeals are identical to the claims in his pro se
brief on direct appeal to the Appellate Division, except for the
addition of the reference to the Fifth and Fourteenth Amendments.
By raising this claim on direct appeal and then expressly raising
the federal nature of the claim to the Court of Appeals,[4]
petitioner has "fairly presented" his claim to the highest court
of the state.  See Porter v. Greiner, No. CV 00-6047, 2005 WL
3344828, at *14 n.15, *15 (E.D.N.Y. Nov. 18, 2005)
(distinguishing Castille); Salcedo v. Artuz, 107 F. Supp. 2d 405,
415 (S.D.N.Y. 2000) ("Merely mentioning a constitutional
amendment in a point heading fairly presents the constitutional
claim to state courts.").

Turning to the merits of the claim, inconsistency in
verdicts is not a ground for habeas relief even with respect to
verdicts that treat co-defendants in a joint trial
inconsistently.  See Harris v. Rivera, 454 U.S. 339, 345 (1981);
see also United States v. Powell, 469 U.S. 57, 63-65 (1984);
United States v. Acosta, 17 F.3d 538, 545 (2d Cir. 1994); Estrada

---

[4] Petitioner may have failed to preserve this claim for
appellate review by not raising it with the trial court prior to
the jury's discharge.  See People v. Granston, 259 A.D.2d 760,
688 N.Y.S.2d 172, 173 (2d Dep't 1999).  Nevertheless, since the
Appellate Division denied petitioner's claim on the merits rather
than relying on this "adequate and independent" state procedural
default, there is no procedural bar to habeas review.  See Harris
v. Reed, 489 U.S. 255, 261-62 (1989).

v. Senkowski, No. 98 CIV. 7796, 1999 WL 1051107, at *13-*14
(S.D.N.Y. Aug. 16, 1999).  In Powell, the Supreme Court
explained:

> [W]here truly inconsistent verdicts have been reached,
> '[t]he most that can be said . . . is that the verdict
> shows that either in the acquittal or the conviction
> the jury did not speak their real conclusions, but that
> does not show that they were not convinced of the
> defendant's guilt.' . . .  It is equally possible that
> the jury, convinced of guilt, properly reached its
> conclusion . . . then through mistake, compromise, or
> lenity, arrived at an inconsistent conclusion, on the
> [other] offense.

469 U.S. at 64-65 (quoting Dunn v. United States, 284 U.S. 390,
393 (1932)).  The criminal defendant's protection against
irrational verdicts is the courts' review of the sufficiency of
the evidence, which entails review of each count independently.
See Powell, 469 U.S. at 67; Harris, 454 U.S. at 344; Acosta, 17
F.3d at 545.

In any event, the verdicts are not necessarily inconsistent.
The jury was specifically instructed "to decide separately with
respect to each defendant whether or not" their guilt had been
proven beyond a reasonable doubt and that "the verdict doesn't
have to be the same for each defendant."  Tr. at 896-97.  In
following this instruction, the jury may have credited Vargas'
identification of petitioner but not his identification of Bryan,
who stood behind the victim during the robbery.

For the foregoing reasons, the state courts' decisions were
neither contrary to, nor an unreasonable application of, clearly
established federal law.

III. Probable Cause to Arrest

   Petitioner claims that the police lacked probable cause to arrest him and all evidence seized should have been suppressed as the fruits of the illegal arrest. See Petition at ¶ 12(C). Specifically, petitioner argues that Vargas had reported being robbed by four men, while petitioner was traveling with only two men in a car with a license plate that did not match the one described by Vargas. See id. The hearing court denied petitioner's suppression motion after an evidentiary hearing and the Appellate Division rejected this claim on the merits.

   As respondent correctly argues, this claim is not cognizable on federal habeas review under the doctrine articulated by Stone v. Powell, 428 U.S. 465 (1976). Under Stone, a habeas petitioner is not entitled to relief for a Fourth Amendment claim "where the State has provided an opportunity for full and fair litigation." Id. at 482. Accordingly, a habeas petitioner's Fourth Amendment claims may be reviewed only "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992). Here, not only did New York provide a corrective procedure to redress petitioner's Fourth Amendment claim in the form of a suppression hearing, petitioner employed that mechanism by litigating his Fourth Amendment claim at the pretrial hearing

and on direct appeal to the Second Department.  Petitioner's
disagreement with the outcome of his motion does not provide a
basis for habeas review.  See id. at 71-72.  In any event, as
discussed below, the police had probable cause to arrest
petitioner after stopping the blue Taurus he was driving and
recovering the knife.

IV. Suggestiveness of Show-up

      Petitioner argues that his show-up identification was unduly
suggestive, pointing to the fact that Vargas identified him from
a distance of 43 feet while petitioner was surrounded by 10 to 12
police officers.  See Petition at ¶ 12(D).  The hearing court
denied petitioner's motion to suppress the identification,[5] which
the Appellate Division affirmed in a 2-to-1 decision, holding
that the identification procedure used was "prompt and reliable"
and "in close spatial and temporal proximity to the scene of the
crime."  James, 768 N.Y.S.2d at 648.

      Due process requires the exclusion of identification
testimony which is so unreliable as to create "a very substantial
likelihood of irreparable misidentification."  Manson v.
Brathwaite, 432 U.S. 98, 116 (1977).  To be admissible, the court
must find either that the identification procedures were not
unduly suggestive or that the identification was independently

---

      [5] The hearing court did not discuss the circumstances
surrounding the identification beyond stating that "when the
complainant was brought over, he said those are the individuals
that robbed me."  H. Tr. at 78.

reliable despite any unnecessarily suggestive procedure.  See
Manson, 432 U.S. at 114; Neil v. Biggers, 409 U.S. 188, 199
(1972); Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001).  If
the identification procedure is found to be unduly suggestive,
the court must consider whether there is an independent basis for
finding that the identification is reliable by considering five
factors:  (1) the opportunity of the witness to view the suspect
at the time of the crime; (2) the witness' degree of attention;
(3) the accuracy of the witness' prior description of the
suspect; (4) the level of certainty demonstrated by the witness
at the confrontation; and (5) the length of time between the
crime and the confrontation.  See Manson, 432 U.S. at 110-14;
Biggers, 409 U.S. at 199.  In determining whether a show-up is
unduly suggestive or whether an identification is independently
reliable, the facts must be considered "in light of the totality
of the circumstances." Manson, 432 U.S. at 113-14; Neil, 409
U.S. at 199-200; United States v. Mohammed, 27 F.3d 815, 821 (2d
Cir. 1994); United States v. Concepcion, 983 F.2d 369, 377-78 (2d
Cir. 1992).

    The Supreme Court has recognized that "the practice of
showing suspects singly to persons for the purpose of
identification, and not as part of a lineup, has been widely
condemned." Stovall v. Denno, 388 U.S. 293, 302 (1967).  Such
identification procedures are by their nature, "inherently
suggestive." Brodnicki v. City of Omaha, 75 F.3d 1261, 1265 (9th
Cir. 1996); Franchischelli v. Potter, No. 03-CV-6091, 2007 WL

776760, at *5 (E.D.N.Y. March 12, 2007); Brisco v. Phillips, 376
F. Supp. 2d 306, 313 (E.D.N.Y. 2005).  On the other hand, as the
Second Circuit has noted, "it is now settled law that prompt on-
the-scene confrontation is 'consistent with good police work' and
does not offend the principles established in United States v.
Wade."  United States ex rel. Cummings v. Zelker, 455 F.2d 714,
716 (2d Cir. 1972) (quoting United States v. Sanchez, 422 F.2d
1198, 1200 (2d Cir. 1970)).  In contrast to station house line-
ups, "prompt confrontation [is] desirable because it serve[s] to
insure 'the immediate release of an innocent suspect and at the
same time [to] enable the police to resume the search for the
fleeing culprit while the trail is fresh.'"  Id.  In fact, the
Second Circuit has instructed the police to "'make immediate
reasonable efforts to confirm the suspect's identity.'"  United
States v. Bautista, 23 F.3d 726, 729-30 (2d Cir. 1994) (quoting
United States v. Valez, 796 F.2d 24, 27 (2d Cir. 1986)).

    Due to the police's interest in quickly exonerating a
suspect, courts generally permit show-ups that are conducted in
close temporal and geographic proximity to the crime.  See
Franischelli, 2007 WL 776760, at *6; Bratcher v. McCray, 419 F.
Supp. 2d 352, 358 (W.D.N.Y. 2006); Brisco, 376 F. Supp. 2d at
313.  Here, the show-up identification took place approximately
45 minutes after the robbery and approximately one mile from
where the robbery occurred.  Tr. at 673, 707-08.[6]

_____

        [6] In reviewing a suppression ruling, the Court may consider
                                                    (continued...)

However, several factors added to the suggestiveness
inherent in the show-up procedure.  Prior to his viewing of the
suspects, police officers told Vargas that they thought they
probably had the people who robbed him.  Such "unnecessary words
or actions that aggravate the inherent suggestiveness of a showup
may render it inadmissible."  <u>Brisco</u>, 376 F. Supp. 2d at 313; <u>see</u>
<u>Mohammed</u>, 27 F.3d at 821 (finding show-up suggestive where
officer told witness "that they had arrested the person they
believed to be the carjacker"); <u>Styers v. Smith</u>, 659 F.2d 293,
297 (2d Cir. 1981) ("notification to a witness that a suspect has
been picked up . . . may be dangerously suggestive when combined
with a show-up rather than a fair line-up"); <u>Bratcher</u>, 419 F.
Supp. 2d at 359 (witness blurting out "that's him" in front of
other witnesses added to the show-up's suggestiveness).

Vargas identified petitioner while in a police van across
the four-lane wide street.[7]  Petitioner and the two other

---

[6](...continued)
the evidence adduced at trial in addition to that presented at
the pre-trial hearing.  <u>See</u> <u>United States v. $557,933.89, More or</u>
<u>Less, in U.S. Funds</u>, 287 F.3d 66, 83 (2d Cir. 2002); <u>United</u>
<u>States v. Canieso</u>, 470 F.2d 1224, 1226 (2d Cir. 1972).

[7] Testimony regarding the distance between Vargas and the
suspects during the show-up varied from 43 feet to 20 feet.  At
the pre-trial hearing, Justice Demakos estimated that the
distance was 43 feet based on where Officer Antoniello pointed to
for reference in the courtroom.  Hearing Tr. at 45.  At trial,
Officer Antoniello estimated the distance was 20-30 feet.  Tr. at
662.  Officer O'Connor testified that the distance was 30 feet.
<u>Id.</u> at 572.  Although at the first trial, Vargas testified that
the distance was 30 feet, he testified at the second trial that
he identified the suspects from 20 feet away.  <u>Id.</u> at 572, 776,
780, 788-89.  What is undisputed is that the van in which Vargas
(continued...)

suspects stood by the sky blue Taurus that Vargas immediately

recognized by its model and color when he first arrived at the

scene. Vargas' identification of the petitioner may have been

affected by the proximity of the blue Taurus. See Raheem, 257

F.3d at 135-37 (holding that line-up was unnecessarily suggestive

where petitioner was only participant wearing black leather coat

which featured prominently in witnesses' descriptions of the

shooter); Wray v. Johnson, 202 F.3d 515, 524 (2d Cir. 2000)

(holding that the show-up identification of a suspect matching

the description of having a black hat and long black coat while

in a jail cell was improperly suggestive); Bratcher, 419 F. Supp.

2d at 359 (petitioner wearing "distinctive green-and-white

sneakers" that matched witnesses' description to police added to

suggestiveness of show-up); Brisco, 376 F. Supp. 2d at 315

(noting that suggestiveness of show-up increased where police

made the suspect hold up a wet pair of maroon shorts that fit the

"distinctive description of the perpetrator's clothing" given by

the victim). Finally, during the identification procedure, there

were at least 8 police officers[8] around petitioner and two other

---

[7](...continued)
sat and the blue Taurus behind which the suspects stood were
stopped on opposite sides of a street that was four-lanes wide in
total.

    [8] At trial, Officer Antoniello testified that there were 10
to 12 officers at the scene, with 4 to 8 officers surrounding the
suspects. Tr. at 662-63; see also H. Tr. at 39-41 (10 to 12
officers stood "right near" the suspects). Vargas testified that
he saw 8 officers at the scene. Tr. at 786.

suspects and 4 to 5 police cars at the stop.[9]  See Bratcher, 419

F. Supp. 2d at 359 (petitioner was flanked by two uniformed

police officers who had him exit the marked police car and walk

toward the bank); Brisco, 376 F. Supp. 2d at 315 (finding show-up

"highly suggestive" where petitioner was shown to the victim

surrounded by three uniformed policemen and two marked and one

unmarked police vehicles with no other individuals in the

immediate area other than uniformed police officers).[10]

    In sum, under the totality of the circumstances, I find the

show-up procedure impermissibly suggestive since both the

officers' pointed statement and the procedures used effectively

"sa[id] to the witness 'This is the man.'"  See Foster v.

California, 394 U.S. 440, 443 (1969) (quoting Biggers v.

Tennessee, 390 U.S. 404, 407 (1968)).  While slightly different

circumstances might have justified  the use of the show-up

identification procedure, no exigencies were present here.  Given

that the suspects' car so closely matched Vargas' description,

_____

    [9] While the Appellate Division noted that the presence of so
many officers was explained by the number of suspects being
detained, see James, 768 N.Y.S.2d at 648, this factor,
nonetheless, added to the already suggestive nature of the
identification procedure.

    [10] But see Torrez v. Sabourin, No. 00 Civ. 3286, 2001 U.S.
Dist. LEXIS 5265, at *14-*16 (S.D.N.Y. April 19, 2001) (show-up
identification while petitioner was on his hands and knees
surrounded by police officers and patrol cars was not unduly
suggestive); United States v. Ortiz, No. 99 Cr. 532, 2000 U.S.
Dist. LEXIS 322, at *2-*3 (S.D.N.Y. Jan. 13, 2000) (show-up
identification while defendants were in handcuffs, standing
beside a marked police car, and accompanied by uniformed police
officers was not unnecessarily suggestive).

the suspects' temporal and geographic proximity to the crime and
the police's recovery of the knife before the victim arrived at
the show-up, the police had sufficient evidence to arrest the
suspects and conduct a line-up at the station house.  See Brisco,
376 F. Supp. 2d at 314-15 ("it appears that the police could have
easily constructed a less suggestive lineup at the police station
within a short period of time rather than conducting a showup").

Irrespective of whether the show-up procedure was unduly
suggestive and unnecessary, due process is satisfied so long as
the identification is independently reliable.  Reliability in
this context means that "the witness's recollection was
undistorted."  Raheem, 257 F.3d at 140.

In assessing reliability under the Biggers factors, no one
factor is dispositive.  See Mohammed, 27 F.3d at 821.  First,
Vargas observed petitioner approach from 20 feet away before the
robbery.  Next, Vargas had ample opportunity to view petitioner
during the robbery, which lasted between three and five minutes,
while petitioner stood directly in front of him about an arm's
length away.  See United States v. Wong, 40 F.3d 1347, 1360 (2d
Cir. 1994) (looking at defendant's face for 2-3 seconds "was
sufficient for identification" to be independently reliable);
Mendoza v. McGinnis, 03 Civ. 2598, 2004 WL 736894, at *7
(S.D.N.Y. April 5, 2004) (finding identification sufficiently
reliable where witness spoke to petitioner "face-to-face, while
standing approximately three feet away for several minutes").
After the robbery, Vargas observed the perpetrators from across

the street and then as they ran towards the car to make their

escape.  Although the robbery occurred at night, the streetlights

nearby provided "pretty good" light.  Vargas also had 20/20

vision.  Tr. at 705.

As to the second factor, Vargas testified that he was

focused on the knife and looked beyond the robbers for an escape

route.  That his attention would be directed toward the knife

rather than petitioner's face is understandable.  See Raheem, 257

F.3d at 138 ("[I]t is human nature for a person toward whom a

[weapon] is being pointed to focus his attention more on the

[weapon] than on the face of the person pointing it"); Smith v.

Smith, No. 02 Civ. 7308, 2003 WL 22290984, at *11 (S.D.N.Y. Sept.

29, 2003) ("Studies have indicated that a crime witness'

attention will often be highly focused on the weapon being used

in the crime (the barrel of a gun or the blade of a knife),

resulting in a reduction in ability of the witness to remember

other details of the crime (including the face of the

assailant)"); Kennaugh v. Miller, 150 F. Supp. 2d 421, 435

(E.D.N.Y. 2001) (finding that degree of witness' attention did

not support independent reliability of identification because

witness had gun pointed at her throughout the time that she

viewed perpetrator).  Vargas also testified that he was agitated

and nervous during the robbery.  However, his fear may have

enhanced his observations of the robbers.  See Vasquez v. Poole,

331 F. Supp. 2d 145, 159 (E.D.N.Y. 2004) ("[The victim's] ability

to focus may have been adversely affected by the fact that she

was terrified . . . but that same fact may have served to sharpen her attention"); Edwards v. Fischer, No. 00 Civ. 7929, 2002 WL 1225538, at *5 (S.D.N.Y. June 5, 2002) (that witness observed the robbers "with attentive fear as they threatened him with a gun" supported the reliability of the identification).

Third, while the evidence at the second trial indicated that Vargas did not describe any physical detail of the perpetrators other than their race and approximate age in his call to 911,[11] "the absence of a prior description by the witness does not necessarily render his or her subsequent identification suspect." Mohammed, 27 F.3d 815; Concepcion, 983 F.2d at 377-78. In fact, Vargas testified he observed that petitioner had facial hair and braided hair and was approximately 5'7" or 5'8".[12] Tr. at 733-36, 765. Finally, the show-up was conducted while Vargas' memory was fresh, only forty-five minutes after the robbery. Indeed, Vargas immediately identified petitioner. Id. at 603.

After balancing the relevant factors, I find that Vargas' identification of petitioner was sufficiently reliable so as to

---

[11] Both parties stipulated to the fact that Vargas gave this description to the 911 operator. Id. at 687. However, on cross-examination, Vargas admitted that he testified in an earlier proceeding (the first trial) that he gave the 911 operator a more detailed description of the defendants. Id. at 725-27. Nonetheless, Vargas denied that he told the 911 operator that the shorter of the two men that approached him had a "like Latrell Sprewell look" and was not clean shaven and the taller man had a "baby face." Id. at 725-27, 778-79.

[12] Corroborating this, Officer Antoniello testified that petitioner was 5'7" and had a goatee or beard and a moustache at the time of his arrest. Tr. at 620-23, 670.

outweigh the suggestiveness of the show-up. He had sufficient opportunity to observe and, in fact, did remember petitioner's physical characteristics and features, notwithstanding the threatening circumstances of the encounter. Therefore, because the findings of reliability made by the state courts were not contrary to, nor involved an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts, I recommend that petitioner's claim be denied.

V.  Weight and Sufficiency of the Evidence

Petitioner claims that (1) there was insufficient evidence at trial to prove his guilt beyond a reasonable doubt, and (2) the verdict was against the weight of the evidence. See Petition at ¶ 12(B). The Appellate Division rejected both claims on the merits. See James, 768 N.Y.S.2d at 648.

It is well established that a weight of the evidence claim is grounded in N.Y. Crim. Proc. Law § 470.15 and thus is unreviewable in a habeas proceeding for not presenting a federal constitutional issue. See Fils-Amie v. Fischer, No. 03 Civ. 939, 2007 WL 117777, at *4 (S.D.N.Y. Jan. 16, 2007); Santana v. Poole, No. CV-03-3946, 2006 WL 3483923, at *9 (E.D.N.Y. Nov. 30, 2006); see also Ex Parte Craig, 282 F. 138, 148 (2d Cir. 1922).

Although a sufficiency of the evidence claim is subject to habeas review, a petitioner "bears a very heavy burden" when challenging a state criminal conviction. See Einaugler v. Supreme

-29-

Court of State of N.Y., 109 F.3d 836, 840 (2d Cir. 1997); Diaz v.

Greiner, 110 F. Supp. 2d 225, 233 (S.D.N.Y. 2000).  A habeas

court may not grant relief on such a claim unless the record is

"so totally devoid of evidentiary support that a due process

issue is raised."  Bossett, 41 F.3d at 830.  Where a petitioner

claims that his guilt was not proven beyond a reasonable doubt,

the relevant question for the court is whether any rational trier

of fact could have found the essential elements of the crime

beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,

319 (1979).  The Court will "view the evidence in the light most

favorable to the government," "construe all permissible

inferences in its favor," and "resolve all issues of credibility

in favor of the jury's verdict."  United States v. Reyes, 157

F.3d 949, 955 (2d Cir. 1998) (internal citations and quotation

marks omitted); see also Jackson, 443 U.S. at 319; Maldonado v.

Scully, 86 F.3d 32, 35 (2d Cir. 1996).

When evaluating a sufficiency of the evidence claim, a

federal court must look to state law to define the elements of

the crime.  Jackson, 443 U.S. at 324; Quartararo v. Hamslmaier,

186 F.3d 91, 97 (2d Cir. 1997).  A person is guilty of robbery in

the first degree when he forcibly steals property and when, in

the course of the commission of the crime, he or another

participant in the crime uses or threatens the immediate use of a

dangerous instrument.  N.Y. Penal Law § 160.15[3].  A person is

guilty of robbery in the second degree when he forcibly steals

property and when he is aided by another person actually present.

N.Y. Penal Law § 160.10[1].  A person is guilty of criminal

possession of a weapon in the fourth degree when he possesses a

weapon with intent to use the same unlawfully against another.

N.Y. Penal Law § 265.01[2].  A person is guilty of menacing in

the second degree when he intentionally places another person in

reasonable fear of physical injury by displaying a deadly weapon.

N.Y. Penal Law § 120.14[1].

"[T]he testimony of a single, uncorroborated eyewitness is

generally sufficient to support a conviction."  Edwards v. Jones,

720 F.2d 751, 755 (2d Cir. 1983); United States v. Danzey, 594

F.2d 905, 916 (2d Cir. 1979).  Here, Vargas' testimony at trial

demonstrated that petitioner stole money from him at knife point

with the help of three other men, two of whom blocked Vargas from

escaping and one of whom took money out of Vargas' wallet.  The

four men fled in a sky blue Ford Taurus which was stopped by the

police about 30 minutes later and from which the police recovered

a knife.  The car stopped by police was driven by petitioner and

matched the description Vargas provided to the 911 operator,

including five of the six characters of the license plate.  About

45 minutes after the robbery, Vargas identified petitioner as the

robber wielding the knife and identified the knife recovered from

the car as the one used to threaten him.  Vargas also identified

petitioner in court.

Petitioner's legal sufficiency claim is entirely based on an

attack of Vargas' credibility as the sole eyewitness.  However,

"assessments of the weight of the evidence or the credibility of

-31-

witnesses are for the jury and not grounds for" habeas relief.
<u>Maldonado</u>, 86 F.3d at 35; <u>Bossett</u>, 41 F.3d at 830 ("The jury is
exclusively responsible for determining a witness' credibility").
The jury clearly credited Vargas' testimony that petitioner was
the perpetrator and it was reasonable for the jury to so find,
notwithstanding some inconsistency between Vargas' testimony and
Officer Antoniello's testimony regarding what Vargas told him.
Because the evidence was sufficient to support petitioner's
conviction beyond a reasonable doubt, the Appellate Division's
decision was neither contrary to, nor involved an unreasonable
application of, clearly established federal law.


                              CONCLUSION

      For the foregoing reasons, I recommend that this Court deny
Michael James' petition for a writ of habeas corpus.  As
petitioner has not made a substantial showing of the denial of a
constitutional right, I further recommend that this Court deny
any application by petitioner for a certificate of appealability.
<u>See</u> <u>Soto v. United States</u>, 185 F.3d 48, 51 n.3 (2d Cir. 1999)
(district court may issue certificate).

      This report and recommendation will be electronically filed
and sent via overnight mail to the petitioner on this date.  Any
objections to this Report and Recommendation must be filed, with
a courtesy copy sent to Judge Cogan and the undersigned, by
October 16, 2007.  Failure to file objections within the

specified time waives the right to appeal.  <u>See</u> 28 U.S.C.

§ 636(b)(1);  Fed. R. Civ. P. 72(b).

      **SO ORDERED.**


Dated:     Brooklyn, New York
           September 28, 2007


                                 /s/
                                 MARILYN DOLAN GO
                                 UNITED STATES MAGISTRATE JUDGE


Copy to:

Michael James
130-12 Inwood Street
Jamaica, New York 11436